**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| LATOYA BOB, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-06-3123 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the court are Plaintiff LaToya Bob's ("Bob") and Defendant Michael J. Astrue's, Commissioner of the Social Security Administration ("Commissioner"),[1] cross-motions for summary judgment. Bob appeals the determination of an Administrative Law Judge ("ALJ") that she is not entitled to receive Title XVI supplemental security income benefits. *See* 42 U.S.C. §§ 416(i), 423, 1382c(a)(3)(A). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, this Court is of the opinion that Bob's Motion for Summary Judgment (Docket Entry No. 10) should be denied, the Commissioner's Motion for Summary Judgment (Docket Entry No. 11) should be granted, and the ALJ's decision denying benefits be affirmed.

---

[1] Michael J. Astrue was sworn in as Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should therefore be substituted for Jo Anne B. Barnhart (former Commissioner) and Linda S. McMahon (interim acting Commissioner) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

I.    *Background*

On July 27, 2004, Bob filed an application for supplemental security income benefits ("SSI"), claiming that she had been disabled and unable to work since May 1, 2004.  (R. 61, 80). Bob alleged that she was suffering from mild mental retardation,[2] hyperthyroidism,[3] and depression.  (R. 61, 83).  After being denied benefits initially on November 1, 2004, and on reconsideration on March 7, 2005 (R. 20-24, 26-28), Bob requested an administrative hearing before an ALJ.  (R. 29-30).

A hearing was held on February 15, 2006, in Houston, Texas, at which time the ALJ heard testimony from Bob and Patricia Cowen, a vocational expert ("VE").  (R. 491-517).  In a decision dated March 31, 2006, the ALJ denied Bob's application for benefits.  (R. 8-17).  On April 11, 2006, Bob appealed the decision to the Appeals Council of the SSA's Office of Hearings and Appeals (R. 9-12), which, on August 3, 2006, declined to review the ALJ's determination.  (R.

---

[2]"Mild Mental Retardation" is roughly equivalent to what used to be referred to as the educational category of "educable." This group constitutes the largest segment (about 85%) of those with the disorder. As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age.  By their late teens, they can acquire academic skills up to approximately the sixth-grade level.  During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress.  With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.  *See* AMERICAN PSYCHIATRIC ASSOCIATION: DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV-TR") 43 (4th ed. 2000).

[3]An abnormality of the thyroid gland in which secretion of thyroid hormone is usually increased and is no longer under regulatory control of hypothalamic-pituitary centers; characterized by a hypermetabolic state, usually with weight loss, tremulousness, elevated plasma levels of thyroxin and/or triiodothyronine, and sometimes exophthalmos; may progress to severe weakness, wasting, hyperpyrexia, and other manifestations of thyroid storm; often associated with exophthalmos (Graves disease).  *See* STEDMAN'S MEDICAL DICTIONARY 856 (27th ed. 2000).

4-6).  This rendered the ALJ's opinion the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Bob filed her original complaint in this case on January 29, 2007, seeking judicial review of the Commissioner's denial of her claims for benefits.  *See* Docket Entry No. 1.

II.   *Analysis*

A.   *Statutory Bases for Benefits*

SSI benefits are authorized by Title XVI of the Act and are funded by general tax revenues.  *See* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100 (14th ed. 2001).  The SSI Program is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line.  *See* 20 C.F.R. § 416.110.  Eligibility for SSI is based upon proof of indigence and disability.  *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C).  A claimant applying to the SSI program cannot receive payment for any period of disability predating the month in which she applies for benefits, no matter how long she has actually been disabled.  *See Brown v. Apfel*, 192 F.3d 492, 495 n.1 (5th Cir. 1999); *see also* 20 C.F.R. § 416.335.  The applicable regulation provides:

> When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application.  If you file an application after the month you first meet all the other requirements for eligibility, we cannot pay you for the month in which your application is filed or any months before that month.

*See* 20 C.F.R. § 416.335.  Thus, the month following an application, here, August 2004, fixes the earliest date from which benefits can be paid.  Eligibility for SSI payments, however, is not dependent on insured status.  *See* 42 U.S.C. § 1382(a).

3

Applicants seeking benefits must prove "disability" within the meaning of the Act, which defines disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(A).

      B.     ***Standard of Review***

         1.     ***Summary Judgment***

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000). If there are no issues of material fact, the court shall review any questions of law *de novo*. *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See*

4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass' n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2.   *Administrative Determination*

Judicial review of the Commissioner' s denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence.  *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).  " Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner' s decision; it must be more than a mere scintilla and less than a preponderance.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court " scrutinize[s] the record to determine whether such evidence is present."  *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted).  If the Commissioner' s findings are supported by substantial evidence, they are conclusive and must be affirmed.  *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).  Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision.  *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).  The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *See Masterson*, 309 F.3d at 272.  In short, " [c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *See Id*.

5

**C.**   *ALJ's Determination*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. § 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. § 416.920(d).

4. If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. § 416.920(e).

5. If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. § 416.920(f).

*See Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 705.  The claimant has the burden to prove disability under the first four steps. *See Myers*, 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing.  *See Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236. If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of his or her existing impairments, the burden shifts back to the claimant to prove that he or she cannot, in fact, perform the alternate work

suggested.  *See Boyd*, 239 F.3d at 705.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *See id*.

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992).  An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act.  *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  A claimant is deemed disabled under the Act only if she demonstrates an " inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *See Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A).  " Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit.  *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. § 416.972.

A medically determinable " physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3).  " [A]n individual is 'under a disability, only if [her] impairments are of such severity that he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .' "  *See*

*Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)).  This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied.  *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A).

In the case at bar, when addressing the first four steps, the ALJ determined:

1.    The claimant has not engaged in substantial gainful activity at any time relevant to this decision.  *See* 20 C.F.R. § 416.920(b).

2.    The claimant has the following severe impairment: depression.  *See* 20 C.F.R. § 416.920(c).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 416.920(d), 416.925 and 416.926.

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a broad range of work.  The undersigned finds that the claimant is restricted from detailed work and work requiring sustained concentration, persistence and pace for prolonged periods.  She can have occasional interaction with the general public.

(R. 13-16).  As to the fifth step, the ALJ concluded:

5.    The claimant has no past relevant work.  *See* 20 C.F.R. § 416.965.

6.    The claimant was born on August 25, 1984 and was 19 years old on the alleged disability onset date, which is defined as a younger individual age 18-44.  *See* 20 C.F.R. § 416.963.

7.    The claimant has a limited education and is able to communicate in English. *See* 20 C.F.R. § 416.968.

8.    Transferability of job skills is not an issue because the claimant does not have past relevant work.  *See* 20 C.F.R. § 416.968.

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform.   *See* 20 C.F.R. §§ 416.960(c) and 416.966.

10.     The claimant has not been under a " disability," as defined in the Social Security Act, at any time through the date of this decision.  *See* 20 C.F.R. § 416.920(g).

(R. 16-17).

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied.  *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Bob's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors:  (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the plaintiff's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the plaintiff's age, educational background, and work history.  *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)).  Any conflicts in the evidence are to be resolved by the ALJ, and not the court.  *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

9

D.    *Issues Presented*

Bob contends that the ALJ failed to evaluate her mental retardation under § 12.05C.[4]  *See*
Docket Entry No. 10.  The Commissioner disagrees with Bob's contentions, maintaining that
Bob's submission of additional evidence and her claim that the ALJ failed to properly evaluate
whether she was disabled, due to mental retardation, does not warrant a remand.  *See* Docket
Entry No. 11.

E.    *Review of the ALJ's Decision*

1.    *Objective Medical Evidence and Opinions of Physicians*

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of
the claimant's impairment is compared to a list of impairments presumed severe enough to preclude
any gainful work." *See Sullivan v. Zebley*, 493 U.S. 521, 525 (1990).  If the claimant is not actually
working and her impairments match or are equivalent to one of the listed impairments, she is
presumed to be disabled and qualifies for benefits without further inquiry.  *See id*. at 532; *see also*
20 C.F.R. § 416.920(d).  When a claimant has multiple impairments, the Act requires the
Commissioner to "consider the combined effect of all of the individual's impairments without regard
to whether any such impairment, if considered separately, would be of such severity." *See* 42 U.S.C.

---

[4]Listing 12.05.  Mental retardation: Mental retardation refers to significantly subaverage general
intellectual functioning with deficits in adaptive functioning initially manifested during the developmental
period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.  The required level
of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

* * *

C.       A valid verbal, performance, or full scale IQ of 60-70 and a physical or other mental
         impairment imposing an additional and significant work-related limitation of function.

*See* 20 C.F.R. pt. 404, subpt. P, App. 1 § 12.05C.

§ 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).  The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.  If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process.  If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

*See* 20 C.F.R. §§ 404.1523, 416.923; *see also Loza*, 219 F.3d at 393.  The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment.  *See Zebley*, 493 U.S. at 531.

The claimant has the burden to prove at step three that her impairment or combination of impairments is equivalent to or greater than a listed impairment.  *See id.* at 530-31; *Selders*, 914 F.2d at 619.  The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect.  *See Zebley*, 493 U.S. at 529-30.  Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results.  *See id.* at 530.  For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria.  *See id*.  An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria.  *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.  *See id.* at 531 (citing 20 C.F.R. § 416.926(a)).  A claimant's disability is equivalent to a listed impairment if the medical

findings are at least equal in severity and duration to the listed findings. *See* 20 C.F.R. §§ 404.1526(a), 416.926(a). The applicable regulations further provide:

(1)(I)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—

(A)   You do not exhibit one or more of the medical findings specified in the particular listing, or

(B)   You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

(ii)   We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

*See* 20 C.F.R. §§ 404.1526(a), 416.926(a). Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *See Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. §§ 404.1527(e), 416.927(e).

A review of the medical records submitted in connection with Bob's administrative hearing reveals that Bob has an eighth grade education; she completed half of the ninth grade, but did not finish the entire year. (R. 497). While in school, Bob attended regular classes and was not enrolled in "special education" courses. (R. 108, 497). Bob is able to read and write the English language, and when asked by the ALJ if she can do basic arithmetic like addition and subtraction, she stated that she is "not that good at subtraction." (R. 497). A review of the record reveals that Bob has neither obtained a general education diploma ("GED") nor received

specialized or vocational training.  (R. 497, 498).  Indeed, the record does not indicate that Bob
has ever attempted to get a job.  (R. 498).

Bob initially claimed that she was disabled due to pregnancy, listed as her primary
diagnosis, and thyroid disease along with high blood pressure.  (R. 18, 61).  Bob listed that she
was taking Synthroid for her hyperthyroid condition and baby aspirin for her blood pressure
without any experience of side effects.  (R. 66).  In a disability examiner's report, Bob's
behavior, appearance, grooming, and degree of limitations were described as follows:  "Bob
dressed okay, she walked normal, spoke normal, her understanding and coherency were adequate,
and she could sign her name."  (R. 81).  Then on reconsideration, Bob's primary diagnosis was
listed as having an adjustment disorder with depressed mood;[5] pregnancy as her secondary
diagnosis; and she also stated that she was "taking a shot so she would not develop blood clots,
and she cried a lot at home."  (R. 19, 83, 93).  Bob took Levothyroxine for her thyroid which she
stated she "experienced side effects of depression."  (R. 85).  Bob took Lovenox to prevent blood
clots.  (R. 85).  She noted that her conditions did not affect her ability to care for her personal
needs; however, Bob opined that changes had occurred with her daily activities and that she "does
not get out very much because she is now suffering from depression."  (R. 85).

From the period of May 9, 2002 to January 29, 2005, Bob was treated by Joseph Murphy,
M.D. ("Dr. Murphy"), her lead treating physician for her pregnancies.  (R. 428-490).  On
September 4, 2002, Dr. Murphy delivered Bob's first child by a primary low vertical cesarean

---

[5]The essential feature of an Adjustment Disorder is a psychological response to an identifiable
stressor or stressors that results in the development of clinically significant emotional or behavioral
symptoms.  This subtype should be used when the predominant manifestations are symptoms such as
depressed mood, tearfulness, or feelings of hopelessness.  *See* DSM-IV-TR, *supra,* at 679.

section.  (R. 454-457).  Dr. Murphy noted that Bob's preoperative diagnosis was intrauterine pregnancy at 29-6/7 weeks gestation; non-reassuring fetal heart tracing, remote from delivery; severe preeclampsia;[6] and intrauterine growth restriction.  (R. 454).  Her postoperative report, completed by Dr. Murphy, was the same.  (R. 454).  Her ultrasound reports noted that her child's fetal anatomy appeared normal; the baby had signs of intrauterine growth restriction (R. 458-459, 468, 472, 474-475, 477); and the lab tests that were performed on Bob did not reveal any abnormal findings with Bob's health.  (R. 460-466, 469-471, 478-481, 484-487).

During the period from May 10, 2004 to January 29, 2005, Bob was also treated by Catherine L. Karmel, M.D., P.A. ("Dr. Karmel") in conjunction with her baby.  (R. 131-145). Dr. Karmel noted that Bob was a high risk patient due to the complications Bob experienced with the delivery of her first child.  (R. 131-134).  Dr. Karmel made notes stating that Bob's rubella[7] was equivocal; her previous cesarean section showed low vertical and extension; she had poor obstetrician history that included severe preeclampsia, plus hyperthyroidism.  (R. 131-134).  The ultrasounds that were taken of Bob on September 24, November 22 and 29, December 3, 6, 9, 17, and 23 of 2004 showed good fetal movement; normal fetal anatomy; breathing; and tone with intrauterine growth restriction with oligohydramnios.[8]  (R. 137-145).

---

[6]Occurrence of one or more convulsions, not attributable to other cerebral conditions such as epilepsy or cerebral hemorrhage, in a patient with preeclampsia.  *See* STEDMAN'S, *supra*, at 563.

[7]An acute but mild exanthematous disease caused by rubella virus, with enlargement of lymph nodes, but usually with little fever or constitutional reaction; a high incidence of birth defects in children results from maternal infection during the first trimester of fetal life.  *See* STEDMAN'S, *supra*, at 1582.

[8]The presence of an insufficient amount of amniotic fluid (less than 300 mL at term).  *See* STEDMAN'S, *supra*, at 1258.

On July 26, 2004 and August 16, 2004, Bob received outpatient care for her pregnancy from Sue M. Palmer, M.D., P.A. ("Dr. Palmer").  (R. 2, 113-117).  Dr. Palmer performed ultrasounds on Bob in which Dr. Palmer observed that Bob was a healthy female and that Bob's baby showed normal growth; normal amniotic fluid; appropriate fetal activity; low risk for fetal anomalies and/or chromosomal problems; and that the estimated due date of January 29, 2005, was consistent with Bob's previous ultrasound examinations.  (R. 113-117, 431).

On November 1, 2004, there was a Case Assessment Form completed on Bob which stated that her diagnosis of pregnancy was a non-severe impairment and was not expected to last 12 months.  (R. 130).  This assessment was affirmed on January 5, 2005.  (R. 130).  James A. Wright, the examiner, noted in his summary of pertinent medical evidence that Bob " is alleging disability due to thyroid disease, pregnancy and hypertension.  According to medical records on file, dated August 16, 2004, the claimant is a healthy female.  A sonogram of the fetus reflects normal growth.  Claimant's blood pressure on September 9, 2004 was 120/70; on August 12, 2004 it was 110/80; and on July 14, 2004 it was 110/70."  (R. 130).

On November 22, 2004, Bob was admitted to Memorial Hermann Hospital (" Hermann") for threatened premature labor.  (R. 354-356).  Bob was discharged in stable condition on November 25, 2004, with a final diagnosis being intrauterine pregnancy at 30 weeks gestation; symmetrical intrauterine growth restriction; oligohydramnios; and protein C&S deficiencies.  (R. 357-358, 359-420, 440).  The procedures performed on Bob were a biophysical profile, electronic fetal monitoring, a maternal-fetal consult by Dr. Palmer, and a subcutaneous administration of Lovenox.  (R. 354-356, 359-420, 440).  On November 26, 2004, Bob was admitted to Hermann for a chief complaint of threatened premature labor and lower back pain.  (R. 328-353).  Bob was

discharged on the same day for false labor and Dr. Murphy wrote no restrictions for her activity. (R. 328-353).

During the last trimester of Bob's pregnancy, Bob visited G. K Ravichandran, M.D. ("Dr. Ravichandran") for a psychiatric evaluation.  (R. 118-129).  On the client information form, Bob alleged that she was "depressed and could not sleep" and that these symptoms began about six months prior to her seeking treatment.  (R. 118).  Bob also noted that she had never received any professional assistance before, nor was she ever hospitalized for psychological problems.  (R. 118-119).  No history of substance abuse, psychiatric/emotional illness in her family, or suicidal thoughts/attempts was noted.  Bob reported good interpersonal relationships with her family and friends, but alleged that she felt uncomfortable when placed in social situations.  (R. 119-122).  Bob maintained that in order to cope with stress and frustration, she "tries to watch television."  (R. 121).  Bob alleged that she had suffered from headaches, dry mouth, dizziness, numbness, back pain, inability to relax, chest pain, stomach trouble, body shaking, watery eyes, nausea, excessive sweating, sore muscles, high blood pressure, and trouble getting her breath.  (R. 121, 126).

Bob also stated that she was always overly sensitive; worried; had difficulty getting sleep; experienced outbursts of anger; cried easily; easily annoyed or irritated; tense or nervous; had trouble remembering things; and had mood swings.  (R. 124).  Bob alleged that she often had difficulty making decisions; overeating; difficulty with concentrating; loss of interest in things; mind going blank; bad dreams; guilty feelings; and feelings of being worthless.  (R. 124).  According to Bob, she worried about being hurt, criticized and talked about.  (R. 125).  Bob, however, reported that she did not consider herself a failure; she liked herself; she did not blame

16

herself for everything bad that happens to her; and was not hard for her to get interested in activities (R. 121, 126); social events did not scare her; and she was not afraid of people in authority.  (R. 126).  During the psychiatric examination performed on Bob, it was charted that she had a distressed appearance; inappropriate affect; poor attention and concentration; soft speech; unpredictable mood; tangential thought process; normal thought content; and no suicidal or homicidal ideas.  (R. 128).

On December 30, 2004, Bob was again admitted to Hermann for a chief complaint of threatened premature labor and pain in legs, and she was discharged on the December 31, 2004, with no restrictions with her activity.  (R. 313-327).

On January 4, 2005, a final report was written by Dr. Murphy in which he stated that Bob's final diagnosis was intrauterine growth restriction pregnancy at 30 weeks gestation; symmetrical intrauterine growth restriction; oligohydramnios; protein C&S deficiency; history of severe preeclampsia at 29 weeks in a prior pregnancy; and previous classical cesarean section.  (R. 357-358, 437-438).   The procedures that were performed on Bob were electronic fetal monitoring; a maternal-fetal medicine consult by Dr. Palmer; and a subcutaneous administration of Lovenox.  (R. 357-358, 437-438).

On January 9, 2005, Bob was admitted to Hermann for labor and delivery by cesarean section.  (R. 170-312).  Dr. Murphy, Bob's delivery physician, noted in Bob's preoperative diagnosis, upon her admittance for delivery, that Bob, 20 years old at the time, was at 37-1/7 weeks gestation; previous low vertical cesarean section; intrauterine growth restriction; protein C&S deficiencies with Lovenox taken as medication; history of severe preeclampsia at 29 weeks in her last pregnancy; hypothyroidism with Synthroid taken as medication; and group B strep

17

positive.  (R. 185, 194-196, 434).  Dr. Murphy charted, in Bob's operative report, that Bob tolerated the procedure well; there were no pregnancy complications; and Bob's child was born alive with no abnormalities.  (R. 196, 198, 435).  With Bob's postoperative diagnosis, Dr. Murphy listed Bob's primary procedure as repeat low transverse cesarean section with antenatal complications as hypothyroidism; intrauterine growth restriction; protein C&S deficiencies; group B strep positive; and pelvic adhesive disease.  (R. 177, 194-196, 434).  Dr. Murphy listed on a discharge form Bob's medications as Vicodin and ibuprofen for pain related to the delivery of her second child.  (R. 178).  Dr. Murphy also noted that regarding Bob could return to work in six (6) weeks.  (R. 178).  On January 13, 2005, Bob's discharge date, it was noted by a registered nurse that Bob's discharge pain scale was a 0 on a 10-point scale.  (R. 290, 304).

On January 26, 2005, a psychiatric progress note, written by Dr. Karmel, stated that Bob's chief complaints were depression, anxiety, and hallucinations.  (R. 135).  It was also noted that Bob's appearance was casual; her mood was stressed; her affect was constricted and anxious; her speech was normal; her thought process was goal directed; her thought content was paranoid; and she had no suicidal or homicidal thoughts.  (R. 135).  Bob's assessment was that she was doing well, but she had persistent anxiety, depression, and insomnia.  (R. 135).  The intervention that was charted to be taken with Bob was stress and medication management.  (R. 136).

Approximately one-month following the birth of her child, on February 12, 2005, J. L. Paterson, Ph. D. ("Dr. Paterson"), conducted a Consultative Clinical Interview and Mental Status Examination on Bob.  (R. 146-151).  Dr. Paterson's diagnostic impression was as follows:

AXIS I:     309.00 Adjustment disorder with depressed mood.
AXIS II:    Deferred
AXIS III:   See medical reports

18

AXIS IV:     Psychosocial stressors; unemployed, depressed, medical problems; Severity: 4 = Severe.

AXIS V:     Current Global Assessment Functioning (" GAF"): 70;[9] Highest GAF past year: 70.

(R. 149).

Dr. Paterson noted that if benefits were assigned, Bob would be able to manage benefit payments in her own interest.  (R. 151).  Some of the pertinent behavioral observations that were noted by Dr. Paterson include:

1.     Bob was on-time and drove herself, but stated that she does not drive or use public transportation.  She depends on friends.  (R. 146-148).

2.     Bob' s gross motor movements were fluid and well coordinated; good eye contact.  (R. 146).

3.     Bob verbally expressed herself at a basic level of English; speaks slowly. (R. 146).

4.     Bob reported she had depression because of her medical problems, and the premature birth of her first child.  (R. 147).

5.     Her personal hygiene appeared good; cares for herself and her two children.  (R. 146-147).

6.     Described herself as a loner; reserved but socially appropriate during exam. (R. 148).

7.     Described herself as easily upset by even minor stressors " one minute I' m happy and the next minute I' m mad at everybody."  (R. 148).

8.     Reading and writing skills are described as below average.  (R. 148).

---

[9] A GAF score represents a clinician' s judgment of an individual' s overall level of functioning. *See* DSM-IV-TR, *supra*, at 32.  The reporting of overall functioning is done by using the GAF scale, which is divided into ten ranges of functioning.  The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range.  A GAF rating of 70 indicates some mild symptoms (*e.g.*, depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.  *See id*. at 34.

9.     Reported she sometimes has problems with concentration and completing tasks.  (R. 148).

10.    Reported that she shops for herself and manages her finances.  (R. 148).

During the Mental Status Examination, Dr. Paterson noted:

1.     Bob's affect appeared flat during the exam; thought process was circumstantial.  (R. 148).

2.     Her thought content included no report of delusions, hallucinations, obsessions, or phobias, however, Bob's reported social withdrawal had a compulsive character.  (R. 148).

3.     Bob's immediate memory was mildly deficient; recent memory was intact; and her memory for remote events was deficient.  (R. 149).

4.     Her concentration and insight appeared fair; and was oriented to person and place.  (R. 148).

On March 2, 2005, J. M. Chappuis, Ph.D. ("Dr. Chappuis"), completed a Psychiatric Review Technique Form for the SSA regarding Bob's alleged adjustment disorder with depressed mood.  (R. 156-169).  Dr. Chappuis noted that Bob had a medically determinable impairment that was present that did not precisely satisfy the diagnostic criteria of § 12.04 Affective Disorders,[10] as the depressive syndrome was only characterized by sleep disturbance.  (R. 159).  Dr. Chappuis also noted that Bob had a moderate degree of limitation in her restriction of daily living activities and maintaining social functioning; a mild degree of limitation with difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  (R. 166).

---

[10]Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.  *See* 20 C.F.R. Subpt. P of Part 404, App. 1, Listing 12.04.

From the period of May 10, 2005 to October 7, 2005, Gerardo Bueso, M.D. (" Dr. Bueso") (R. 422-428) conducted lab testings in which he found normal findings with Bob's metabolic panel, hemoglobinopathy profile, iron and TIBC, and ferritin serum. (R. 423-424). In a radiology test, ordered by Dr. Bueso, the results showed negative findings with her heart, lungs and bony thorax for Bob. (R. 425-427).

" [O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings. *See Scott*, 770 F.2d at 485. Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown. *See Myers*, 238 F.3d at 621; *Loza,* 219 F.3d at 395; *Greenspan*, 38 F.3d at 237. Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *See Myers*, 238 F.3d at 621; *Newton* 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994).

It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for

determining a claimant's disability status.  *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

In the case at bar, Bob argues that the ALJ failed to evaluate her mental retardation under the requirements of § 12.05C, and that her mental retardation and poor level of education was not mentioned in the ALJ's decision.  *See* Docket Entry No. 10.  Bob contends that new evidence of her alleged mental retardation should warrant a remand.  Attached as Exhibits B and C to Bob's Motion for Summary Judgment are evaluations regarding Bob's alleged mental retardation that were conducted ***after*** the Appeals Council had denied review and the ALJ's decision became the final decision of the Commissioner.  *See* Docket Entry No. 10, at Exhs. B and C.

Indeed, approximately one-month after the Appeals Council denied review of the ALJ's decision, on September 11, 2006, Jaime Ganc, M.D. ("Dr. Ganc") completed a Psychiatric Report of Bob.  *See* Docket Entry No. 10, at Exh. C.  Dr. Ganc noted his diagnostic impression of Bob as follows:

|  |  |
|---|---|
| AXIS I: | Schizoaffective disorder with psychotic features. |
| AXIS II: | Mild mental retardation. |
| AXIS III: | Mixed personality disorder with hysteroid, dependent, and schizoid features. |
| AXIS IV: | Hypothyroidism; multiple somatic complaints; severe due to her physical and mostly because of her psychiatric condition. |
| AXIS V: | GAF of 38.[11] |

*See* Docket Entry No. 10, at Exh. C.  Dr. Ganc opined on Bob's prognosis:

_____

[11]A GAF rating of 38 indicates some impairment in reality testing or communication (*e.g.*, speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *See* DSM-IV-TR, *supra*, at 34.

> Ms. Bob is extremely handicapped individual who is totally unable to work in any capacity. She can barely take care of herself. Her psychiatric condition is such that she feels totally handicapped and, besides that, I do not feel that she is an individual who can be trained in any work capacity no matter how easy and simple the work can be. She is psychotic and tends to avoid any kind of relationships that aggravate her condition.

*See* Docket Entry No. 10, at Exh. C

Several months later and shortly before filing this lawsuit, on January 2, 2007, Ted Jolly

(" Jolly"), a psychologist, and Tomas G. Soto, Ed.D., L.P.A. (" Dr. Soto") completed a

Psychological Report regarding Bob' s alleged mental retardation. *See* Docket Entry No. 10, at

Exh. B.   The clinical impression of the psychological evaluation, that Jolly and Dr. Soto

administered to Bob was as follows:

> AXIS I:     By history, dysthymic disorder.  300.4.[12]
> AXIS II:    Mild Mental Retardation.  317.00.
> AXIS III:   Hyper thyroid condition that apparently triggers a variety of physical symptoms.  (Her report.)
> AXIS IV:    Psychosocial Stressors: 4-severe

*See* Docket Entry No. 10, at Exh. B.   Jolly and Dr. Soto summarized Bob' s level of mental

retardation:

> The nature and content of Bob' s responses to objective psychological tests indicate that her functional intelligence is in the ***mild level of mental retardation***. Although, there is one area of discernible strength, namely, auditory rote learning memory, for the most part, she had much difficulty with tasks requiring

---

[12]Depressed mood for most of the day, for more days than not, as indicated either by subjective account or observation by others, for at least 2 years.  No Major Depressive Episode has been present during the first 2 years of the disturbance.  There has never been a Manic Episode, a Mixed Episode, or a Hypomanic Episode, and criteria have never been met for Cyclothymic Disorder.  The disturbance does not occur exclusively during the course of a chronic Psychotic Disorder, such as Schizophrenia or Delusional Disorder.  The symptoms are not due to the direct physiological effects of a substance (*e.g.*, a drug of abuse, a medication) or a general medical condition (*e.g.*, hypothyroidism).  The symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning. *See* DSM-IV-TR, *supra*, at 380, 381.

concentration and logical thinking.  Her information is narrow in scope.  She is slow and unimaginative when performing non verbal tasks.  Her academic skills are below of what can be expected from her 8th grade education.  Bob projects herself as experiencing symptoms of depression akin to dysthymia.   Just as important is claim that she suffers from a hyper thyroid condition that is responsible for sundry physical disorders that limit her ability to work and be self-sufficient.  She claims that she is not under medical monitoring because of lack of financial resources.  Bob is thoroughly frustrated by the fact that, according to her, her physical condition has never been treated adequately and is a major impairment in her overall adaptive behavior.

See Docket Entry No. 10, at Exh. B (emphasis added).

These reports are not part of the underlying administrative record; hence, the Court must determine if it should consider the reports as additional evidence.  A district court may order additional evidence to be heard " . . . only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); see also Falco v. Shalala, 27 F.3d 160, 164 (5th Cir.1994).

Here, the evidence does not pertain to the contested time period, that is on or before the date of the ALJ's decision.  See 20 C.F.R. § 416.1576(b)(1).  In fact, Bob admits that this evidence was " conducted and completed approximately five to eight months" after the ALJ's decision dated March 31, 2006.  See Docket Entry No. 10, at p. 8.  Additionally, this evidence was not conducted and completed before the Appeals Council denied its review on August 3, 2006.  (R. 4-7).

Bob contends that due to her mental retardation, she was " not able to effectively inform neither her attorney nor Defendant of her severe mental deficits at the administrative hearing." See Docket Entry No. 10, at p. 9.  Notwithstanding Bob's contentions, this does not establish

24

good cause for remand in this case. *See Pierre v. Sullivan*, 884 F.2d 799, 803 (5th Cir. 1989) ("The mere fact that a medical report is of recent origin is not enough to meet the good cause requirement."). The psychological testing Bob submits as "new evidence" could have been conducted at any time; however, it was not done until well after the ALJ's decision and the denial of review by the Appeals Council. Thus, similar to *Pierre*, Bob's explanation fails to provide good cause for remand in this case. *See id*. at 802. Moreover, Jolly and Dr. Soto characterized Bob's level as "mild mental retardation." *See* Docket Entry No. 10, at Exh. B.

Additionally, Bob never claimed that she was mentally retarded, which the Fifth Circuit considered relevant in *Pierre*. *See Pierre*, 884 F.2d at 802. The record reflects that Bob initially claimed that she was disabled due to thyroid disease, pregnancy, high blood pressure, and back pain. (R. 11, 53, 61). At the administrative hearing, Bob's counsel claimed disability due to depression, borderline intellectual functioning, hyperthyroidism, hypertension, and "pain all over." (R. 495).

Bob testified that she had completed the eight grade, had made no attempt to obtain a GED, and had been in regular classes, except for a speech class. (R. 108-112, 497). She further stated that she could read and write in English, but had difficulty with arithmetic, especially subtraction. *See id*.

The record evidence further demonstrates that Bob was able to "take care of herself and her two children;" "bathe and dress herself and her children;" "wash dishes and clean up;" "cook for herself and her children;" "care for her personal belongings;" drive (even though she claimed that she "does not drive and does not use public transportation," she drove to an appointment to see Dr. Paterson); and "shop for herself and manage her own finances." (R. 70,

25

89, 147-148, 499).  Although Bob noted that sometimes her mother helps her, the record evidence clearly contradicts the alleged report that Bob was " totally unable to work in any capacity."  (R. 70-71, 88-91, 499).          Finally, Bob had the opportunity to inform the ALJ of her alleged mental retardation when the ALJ questioned her at the hearing about her reasons for not being able to work:

> Q:     What do you feel keeps you from being able to work at the present time?
>
> A:     My problems with me not being able to stand long and my thyroid.  I being paining all over my legs.  I won't be able to last, I mean, not even a week. And I really, I get tired really quick like I'm about to fall then.  I have hot flashes.
>
> Q:     Is there anything about your condition you haven't already told me that you feel I need to know?
>
> A:     No, sir.  That'll be everything.

(R. 507).  Bob's attorney also had the opportunity to present evidence of Bob's alleged mental retardation at the hearing as well:

> ALJ:     . . . Is there any additional documentary evidence you' re going to wish to present after the hearing?
>
> ATTY:     None that I' m aware of, Your Honor.
>
> ALJ:     All right.  I think your firm has submitted updates dealing with Ms. Bob' s physical problems.  There wasn' t anything too current on the depression, but I gather she hasn' t received any recent treatment from the testimony.  Is that essentially correct?
>
> ATTY:     My understanding was that the most current records are from early 2005.  Is that correct?  You haven' t seen Dr. Robashondron (phonetic) or any other psychiatrist?
>
> CLMT:     No.
>
> ATTY:     Okay.

ALJ:        Okay.  Well, that being the case, I'll close the record, and I'll
            issue a written [d]ecision based on the hearing today and the
            documentary evidence that is in the file. . . .

(R. 516).  The evidence in the record at the time of the administrative hearing and review by the

Appeals Council failed to demonstrate that Bob was mentally retarded.

Because the evaluations are inconsistent with the record evidence as a whole and Bob has

not offered good cause as to why the evaluations were not conducted prior to either the ALJ or

Appeals Council decisions, the evaluations will not be considered as additional evidence in this case.

Notwithstanding, one evaluation characterized Bob's mental retardation as "mild."  *See* Docket Entry

No. 10, at Exh. B.  In any event, as set forth above, the record evidence clearly supports the ALJ's

decision that none of Bob's impairments, either singly or in combination, meet or medically equal

one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  (R. 14).  Thus, Bob's

contention that the Commissioner erred in failing to evaluate Bob's alleged metal retardation under

§ 12.05C is without merit.

## 2.    *Subjective Complaints*

The law requires the ALJ to make affirmative findings regarding a claimant's subjective

complaints.  *See Falco*, 27 F.3d at 163 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th

Cir. 1981)).  When a plaintiff alleges disability resulting from pain, she must establish a medically

determinable impairment that is capable of producing disabling pain.  *See Ripley*, 67 F.3d at 556

(citing 20 C.F.R. § 404.1529).  Once a medical impairment is established, the subjective

complaints of pain must be considered along with the medical evidence in determining the

individual's work capacity.  *See id.*

27

It is well settled that an ALJ's credibility findings on a claimant's subjective complaints are entitled to deference.  *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Scott v. Shalala*, 30 F.3d 33, 35 n.2 (5th Cir. 1994); *Falco*, 27 F.3d at 164; *Wren*, 925 F.2d at 128. The Fifth Circuit recognizes that "the ALJ is best positioned" to make these determinations because of the opportunity to observe the claimant first-hand.  *See Falco*, 27 F.3d at 164 n.18. Moreover, "[t]he Act, regulations and case law mandate that the Secretary require that subjective complaints be corroborated, at least in part, by objective medical findings."  *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (citing 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1529; *Owens v. Heckler*, 770 F.2d 1276, 1281-82 (5th Cir. 1985)); *accord Chambliss*, 269 F.3d at 522 (citing *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)); *Hampton v. Bowen*, 785 F.2d 1308, 1309 (5th Cir. 1986).

As a matter of law, the mere fact that working may cause a claimant pain or discomfort does not mandate a finding of disability.  *See Hames*, 707 F.2d at 166; *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980); *accord Brown v. Bowen*, 794 F.2d 703, 707 (D.C. Cir. 1986). Additionally, the mere existence of pain does not automatically bring a finding of disability.  *See Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989); *Owens*, 770 F.2d at 1281.  It must be determined whether substantial evidence indicates an applicant can work despite being in pain or discomfort.  *See Chambliss*, 269 F.3d at 522; *Johnson v. Heckler*, 767 F.2d 180, 182 (5th Cir. 1985).

For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment."  *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  The decision arising from the ALJ's discretion to determine

28

whether pain is disabling is entitled to considerable deference.  *See Chambliss*, 269 F.3d at 522;

*Wren*, 925 F.2d at 128; *James*, 793 F.2d at 706.   However, an ALJ may discount subjective

complaints of pain as inconsistent with other evidence in the record.  *See Dunbar v. Barnhart*, 330

F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)).

At the administrative hearing, Bob testified regarding her complaints of depression and

hyperthyroidism.    (R. 491-517).   The ALJ's decision indicates that the ALJ did consider

objective and subjective factors related to the severity of Bob's subjective complaints.  (R. 13-

17).   In reaching his determination in this regard, the ALJ concluded:

> After considering the evidence of record, the undersigned finds that the claimant's
> medically determinable impairment could reasonably be expected to produce the
> alleged symptoms, but that the claimant's statements concerning the intensity,
> duration, and limiting effects of these symptoms are not entirely credible.  The ALJ
> has taken into consideration the claimant's testimony and allegations of symptoms
> and limitations but rather the degree of limitations or other subjective symptoms
> which the claimant experiences.  The objective clinical findings (although not the
> only factor to be considered) do not support the degree of functional limitations
> which the claimant alleges.

(R. 15).

Here, the ALJ's credibility findings are supported by the evidence in the record.  Bob

reported that she was experiencing mental and emotional problems that limited what she was able

to do.  (R. 88, 501).   Notably, Bob first reported these alleged depressive symptoms during the

last month of her pregnancy and immediately following the birth of her second child.  (R. 88, 118-

129, 135-136, 146-151).   During Dr. Paterson's examination of Bob and subsequently during

the administrative hearing, however, Bob reported that she was able to "take care of herself and

her two children," "cook," "clean," "shop for herself," "drive," "pay bills," and maintain her

residence with occasional assistance from her mother.   (R. 70-71, 88-91, 147-148, 499).

According to Bob, Dr. Ravichandran prescribed Zoloft for Bob's alleged mental and emotional

problems and that she did not experience any side effects from the antidepressant medication.  (R. 88, 504).  Dr. Paterson diagnosed Bob with having a GAF score of 70 which indicates some mild symptoms (*e.g.*, depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (R. 149); however, mild symptoms do not support a finding of disability. (R. 16).  As noted by the ALJ, although Bob had sought treatment for her depression, the medical records do not show repeated hospitalizations or episodes of worsening that would be expected if she experienced severe, persistent and unremitting depression.  (R. 16).  *See Chambliss*, 269 F.3d at 522; *Falco*, 27 F.3d at 163; *Wren*, 925 F.2d at 128.  Consequently, the ALJ properly found that Bob's depression only had a mild impact upon her ability to perform daily activities.  (R. 13).

With respect to her hyperthyroidism, Bob testified that she has "pains and aches all over." (R. 502).  She further testified, "I'm thinking it's arthritis, I don't know, but every time it gets cold it hurts.  My whole body just hurts all over, and I feel dizzy, nauseated.  I have really bad headaches." (R. 502).  Bob indicated that she was taking Synthroid for her hyperthyroid condition and baby aspirin for her blood pressure without any experience of side effects.  (R. 66).  There is medical evidence to support Bob's claim that she has hyperthyroidism.  (R. 61, 83, 131-134, 495).  The record reveals that Bob stated "when I don't take my medication" it triggers physical problems or makes them worse, however, to make her physical problems better, Bob said she "takes [her] medication." (R. 70).  According to Bob, she takes daily shots and oral medication to treat the hypothyroidism.  (R. 14, 61).  Medical impairments that reasonably can be remedied or controlled by medication or treatment are not disabling." *See Johnson v. Bowen*, 864 F.2d 340, 347 (5th Cir. 1988); *Fraga v. Bowen*, 810 F.2d 1296, 1303-04 (5th Cir. 1987).  Here, Bob's hypothyroidism and hypertension are controlled with medication.  (R. 14).  Hence, there is

substantial evidence that supports the ALJ's finding that Bob's subjective reports of mental and physical pain do not rise to the level of disability.  (R. 13-17).

### 3. *Residual Functional Capacity*

Under the Act, a person is considered disabled:

> only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

*See* 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  If a claimant demonstrates that she cannot perform her past relevant work, the Commissioner bears the burden of proving that her functional capacity, age, education, and work experience allow her to perform work in the national economy. *See Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 216; *Myers*, 238 F.3d at 619; *Greenspan*, 38 F.3d at 236.  Once the Commissioner fulfills this burden by pointing out potential alternative employment, the claimant, in order to prevail, must prove that she cannot perform the alternate work suggested.  *See Masterson*, 309 F.3d at 272; *Boyd*, 239 F.3d at 705; *Shave*, 238 F.3d at 594; *Carey*, 230 F.3d at 135.

To determine whether a claimant can return to a former job, the claimant's "residual functional capacity" must be assessed.  *See Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990); *see also* 20 C.F.R. § 404.1545.  This term of art merely represents an individual's ability to perform activities despite the limitations imposed by an impairment.  *See Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990); *see also* 20 C.F.R. § 416.945.  RFC capacity combines a medical assessment with the descriptions by physicians, the claimant or others of any limitations on the claimant's ability to work.  *See Elzy v. Railroad Retirement Bd.*, 782 F.2d 1223, 1225 (5th Cir. 1986); *see also* 20

C.F.R. § 416.945.  When a claimant's RFC is not sufficient to permit her to continue her former

work, then her age, education, and work experience must be considered in evaluating whether she

is capable of performing any other work.  *See Boyd*, 239 F.3d at 705; 20 C.F.R. § 416.920.  The

testimony of a vocational expert is valuable in this regard, as "[he] is familiar with the specific

requirements of a particular occupation, including working conditions and the attributes and skills

needed." *See Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986); *accord Carey*, 230 F.3d at 145;

*see also Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995).

In evaluating a claimant's RFC, the Fifth Circuit has looked to SSA rulings ("SSR").  *See*

*Myers*, 238 F.3d at 620.  The Social Security Administration's rulings are not binding on this court,

but they may be consulted when the statute at issue provides little guidance.  *See id*.  In *Myers*, the

Fifth Circuit relied on SSRs addressing RFC and exertional capacity.  *See id*.  In that case, the court

explained:

> First, SSR 96-8p provides that a residual functional capacity (RFC) is an assessment
> of an individual's ability to do sustained work-related physical and mental activities
> in a work setting on a regular and continuing basis.  A regular and continuing basis
> means 8 hours a day, for 5 days a week, or an equivalent work schedule.  The RFC
> assessment is a function-by-function assessment based upon all of the relevant
> evidence of an individual's ability to do work-related activities. However, without
> the initial function-by-function assessment of the individual's physical and mental
> capacities, it may not be possible to determine whether the individual is able to do
> past relevant work. . . .   RFC involves both exertional and non-exertional factors.
> Exertional capacity involves seven strength demands:  sitting, standing, walking,
> lifting, carrying, pushing, and pulling.  Each function must be considered separately.
> In assessing RFC, the adjudicator must discuss the individual's ability to perform
> sustained work activities in an ordinary work setting on a regular and continuing
> basis. . . .  The RFC assessment must include a resolution of any inconsistencies in
> the evidence.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34474-01 (July 2, 1996).  The court further

commented:

> Second, SSR 96-9p also provides that initially, the RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to perform work-related activities. . . .  The impact of an RFC for less than a full range of sedentary work is especially critical for individuals who have not yet attained age 50.   Since age, education, and work experience are not usually significant factors in limiting the ability of individuals under age 50 to make an adjustment to other work, the conclusion whether such individuals who are limited to less than the full range of sedentary work are disabled will depend primarily on the nature and extent of their functional limitations or restrictions.

*Id.* (internal citations omitted); *see* 61 Fed. Reg. 34478 (July 2, 1996).  The court also noted that SSR 96-9p defines "exertional capacity" as the aforementioned seven strength demands and requires that the individual's capacity to do them on a regular continuing basis be stated.  *See id*.  To determine that an claimant can do a given type of work, the ALJ must find that the claimant can meet the job's exertional requirements on a sustained basis.  *See Carter v. Heckler*, 712 F.2d 137, 142 (5th Cir. 1983) (citing *Dubose v. Matthews*, 545 F.2d 975, 977-78 (5th Cir. 1977)).

In the case at the bar, the VE testified that there were a significant number of light and medium unskilled jobs a person of Bob's physical RFC could perform.  (R. 512-514).  When asked to take into consideration someone of Bob's age, education, and vocational background, and that this person would be precluded from performing highly-detailed work; precluded from performing work that would require sustained concentration, attention, and persistence; pace for prolonged periods; and would be limited to only occasional interaction with the public, the VE answered as follows, according to the Dictionary of Occupational Titles ("DOT"):

> Given all of these factors, the individual would be able to perform the requirements of representative occupations such as a baker worker, a kitchen helper and a laundry worker with 3,000 - 5,000 jobs existing in the region and 500,000+ jobs existing in the nation within the medium exertional level.  There would be jobs within the light level of exertion such as an office cleaner, a bench assembler and a garment sorter with 2,000+ jobs existing in the region and 300,000 - 500,000 jobs existing in the nation.  There also would be jobs within the sedentary level of exertion such as an order clerk, a final assembler and a lens inserter with 1,000+ jobs existing in the region and 200,000 - 300,000 jobs existing in the nation.

(R. 17, 512-514).  In his decision, the ALJ acknowledged that Bob may experience symptoms related to her depression and hypothyroidism, and developed an RFC accommodating such alleged limitations.  (R. 13-17).  Thus, contrary to Bob's allegations, the ALJ's RFC correctly found that Bob is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  (R. 17).  Accordingly, substantial evidence supports the ALJ's findings that Bob is capable of making a successful adjustment to other work that exists in the national economy. (R. 17).

**III.    _Conclusion_**

Accordingly, it is therefore

**ORDERED** that Bob's Motion for Summary Judgment (Docket Entry No. 10) is **DENIED**. It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No. 11) is **GRANTED**.  It is finally

**ORDERED** that the Commissioner's decision denying Bob supplemental security income benefits is **AFFIRMED**.

**SIGNED** at Houston, Texas on this the 7th day of January, 2008.

Calvin Botley
United States Magistrate Judge